# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHIRLEY BORING,

    Plaintiff,

      v.

WORLD GYM – BISHOP, INC., et al.,

    Defendants.

No. 06 C 3260
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Defendants, World Gym – Bishop, Inc., Planet Fitness, Inc., World Gym Fitness Center Montrose, Inc., World Gym Wacker, Inc., World Gym – Palatine, Inc., World Gym – Indiana, Inc., World Gym – Racine, Inc. (collectively "Defendants" or "World Gym"), have moved for summary judgment on the five remaining claims of Plaintiff Shirley Boring's Third Amended Complaint. I previously dismissed Count III, Boring's claim for intentional infliction of emotional distress, as preempted by the Illinois Human Rights Act.[1] The remaining claims are: Count I, violation of the Americans with Disabilities Act ("ADA"); Count II, wrongful and retaliatory discharge; Count IV[2], violation of the Family and Medical Leave Act ("FMLA"); Count V, violation of the Fair Labor Standards Act ("FLSA"); and Count VI, a claim for

---

[1] On February 13, 2009 Plaintiff filed a motion for reconsideration of this previous dismissal. I have reconsidered my previous ruling and in light of *Blount v. Stroud*, No. 105511, 2009 WL 153862 (Ill. Jan. 23, 2009), I am reinstating Count III, Plaintiff's claim for intentional infliction of emotional distress. The issue may be properly disposed of on a motion for summary judgment, and I order the parties to submit cross-motions of no longer than five pages each within two weeks of this ruling. Responses by each party limited also to five pages shall be filed one week later.

[2] Plaintiff mislabels this count as "Count VI" in her Third Amended Complaint.

liquidated damages for unpaid overtime. For the following reasons, Defendants' motion for summary judgment is granted in part and denied in part.

## I. PRELIMINARY ISSUES

In addition to their motion for summary judgment, Defendants have also filed various motions to strike, which I address first.

### A. Defendants' Motion to Strike Plaintiff's Local Rule 56.1(b)(3)(B) Response

Defendants move to strike Boring's Local Rule 56.1(b)(3)(B) response to Defendants' statement of uncontested facts because it contains "additional facts, rambling argumentative supposition and conjecture, unsupported conclusory assertions of fact and law, and fails to cite to the Record." To some extent, each of these accusations is true. Many of Boring's responses (for example, responses to paragraphs 12-15, 20, 22, 23, 28, 29, 30, 35, 55, 59, and 60) include additional facts that should have been separately delineated in Boring's separate statement of additional facts as required by the Local Rule. I disregard these additional, unresponsive facts from the record.[3] To the extent that Boring's responses are unresponsive and/or conclusory, I have deemed them stricken from the record and afford them no weight in the following analysis. This applies to Boring's responses to paragraphs 7, 8, 12, 13, 20, 27, and 30. With regard to those responses that do not deny the allegations in the numbered paragraphs with citations to supporting evidence in the record (*i.e.*, responses to paragraphs 18, 22, 26, 33, 43, 49, 50, 53, and 58), I have deemed them admissions. *See McGuire v. United Parcel Service*, 152 F.3d 673, 675

---

[3] Some of these additional, unresponsive facts are appropriately included in Boring's statement of additional facts. To the extent that those facts are appropriately included in Boring's statement of additional facts, I have not disregarded them. *See* discussion *infra* Part I.B.

(7th Cir. 1998) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission.") (citations omitted).

**B.** **Defendants' Motion to Strike Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Facts**

Defendants further object to and move to strike Boring's statement of additional facts on the grounds that they contain allegations that are conclusory, argumentative, misleading, improperly supported and irrelevant to the arguments raised in Defendants' motion. *See* U.S. Dist. N.D. Ill. Local Rule 56.1(b)(3). Many of Boring's statement of additional facts violate the requirements of the Local Rules because they mischaracterize the testimony on which they rely (paragraphs 1, 14, 21), they are immaterial or irrelevant to the pending motion (1, 2, 5, 12, 14-22, 31), are duplicative (2, 6, 11, 14-19, 26-28, 30, 34, 38), or are unduly lengthy (this is true of almost all of Boring's additional statement of facts – paragraph 18 is 18 sentences long). A few particularly egregious examples include: paragraph 5, in which Plaintiff includes a long statement of facts about her diagnosis with scleroderma in 2006 when this case involves her employment at World Gym between 2000 and 2004 and when scleroderma is not included as an impairment in her complaint; paragraph 21, in which Plaintiff not only blatantly contradicts her deposition testimony regarding doctor's advice concerning the lighting in her office but also provides a citation to the record that has to do with temperature and not with lighting; and paragraph 31, which includes the wholly irrelevant statement "When Jason Phillips, the Phillips' son, was fired, Jason called Boring a mother fucker and took a chair and threw it across the room and was like a madman."

I am ruling on Defendants' motion to strike Plaintiff's statement of additional facts consistent with my ruling on Defendants' motion to strike Plaintiff's response to Defendants' statement of facts. I disregard and strike those facts that are either duplicative or irrelevant and those that fail to properly cite to the record.

### C. Defendants' Motion to Strike Declaration of Dr. Phillip Adjei

Defendants' motion to strike portions of the declaration of Dr. Phillip Adjei is granted. Dr. Adjei has been Boring's treating physician since June 2001 for her esophagus and acid reflux. Boring's initial Rule 26(a)(1) disclosures disclosed Dr. Adjei as "Plaintiff's Gastroenterologist. Knowledge of Plaintiff's medical condition, impairments, and limitations." Boring's two subsequent, supplemental Rule 26(a)(1) disclosures also listed Dr. Adjei and included the exact same language regarding the subject of the information for which Dr. Adjei was to testify. Discovery was closed by stipulation of the parties on July 10, 2008. On November 18, 2008, Plaintiff submitted the declaration of Dr. Adjei in conjunction with the filing of her Rule 56.1(b)(3)(B) Responses and Rule 56.1(b)(3)(C) Statement of Additional Facts.

While only disclosed as a fact witness, portions of Dr. Adjei's declaration include expert testimony, and this is improper. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) (treating physicians must be disclosed pursuant to Rule 26(a)(2)(A) as experts if they are to provide expert testimony). Specifically, Dr. Adjei's declaration contains statements relating to the purported causation of Boring's condition and other opinions and conclusions based upon his professional knowledge. Accordingly, I am striking the following portions of Dr. Adjei's declaration: the portions of paragraph 3 that relate to the causation of Plaintiff's condition and various other doctors' purported diagnoses of the same condition as well as

4

paragraphs 4, 6, 7, and 8. I also strike the corresponding paragraphs included in Plaintiff's Statement of Additional Facts: paragraphs 8 and 10.

### D. Defendants' Motion to Strike Declaration of Mamadou Beye

Defendants have also moved to strike the Declaration of Mamadou Beye, which was filed as an exhibit to the fourth amended complaint. Shortly after the filing of the fourth amended complaint, the parties reached and filed a stipulation in which Boring agreed to withdraw the fourth amended complaint, along with the supplemental disclosures and additional discovery that contained the categories of anticipated testimony in Beye's declaration. As a result, Beye's declaration is not a part of the record and any reliance upon it must be stricken. I am granting Defendants' motion to strike the declaration of Mamadou Beye, including paragraphs 51, 52, and 53 of Plaintiff's Statement of Additional Facts which rely on the Beye declaration.

## II. FACTUAL BACKGROUND

In light of my rulings on the preliminary issues, the following are clusters of material facts to which there is no genuine issue of dispute:

### A. The parties

Boring was hired at World Gym, an Illinois corporation, in June of 2000 to perform data entry and was quickly promoted to the positions of accounts payable and secretary. Boring's resume states that during her employment at World Gym she was "office manager of World Gym," "managed 8 full-time employees," "assisted company controller in budgeting, locating and reducing company losses," "recommended changes that increased the monthly collections of bad debt by the outside collections company," and was "responsible for accounts payable for 6 locations." Boring's job duties included helping to implement revisions to and produce World

Gym's employee handbook; making sure there was enough money in the payroll; making arrangements with leasing companies for the payment of loans; ordering, picking up, and occasionally delivering supplies; paying all of the bills for each gym location, including writing checks; typing letters; and at times overseeing the paperwork of another World Gym employee, Arletha Thomas.

Al Phillips is the president and sole owner of World Gym. Barbara Phillips, Al's wife, is an employee of World Gym and does not have any ownership interest. At some point during her employment at World Gym, Boring was close with both Al and Barbara Phillips on a professional and personal level.

### B. Boring's termination from World Gym

On August 16, 2004, Al Phillips terminated Boring's employment at World Gym. The facts leading up to the termination are as follows: On the evening of Saturday, August 7, 2004, while dining at a restaurant in Wisconsin with his wife and friends, Al Phillips received an "emergency call" from Boring. Al Phillips was shocked to hear from the restaurant that he had an emergency phone call because his mother was in the hospital and his daughter was driving to South Dakota. Boring knew about Al's mother and about Al's daughter's travel plans and about where and when Al would be having dinner that night. During the phone conversation at the restaurant, Boring accused Barbara Phillips of making about seven harassing and threatening phone calls to Boring earlier that day in which Barbara yelled, "aren't you dead yet, you bitch, from the brain tumor?" Al Phillips informed Boring that Barbara had been with him all day and therefore he knew that she could not have made such phone calls. But, in any event, Al Phillips told Boring that he would consider her accusations and investigate the matter.

According to Boring, Barbara Phillips previously, beginning around July 3, 2004, made other phone calls and left voice messages on Boring's phone saying "watch your back. Watch your car. Watch your house, you bitch." However, Boring has no record of those phone calls or evidence of any voice messages from Barbara. According to Boring, she discussed at least one of the voice messages with her mother. Barbara denies ever making any harassing phone calls to Boring.

Approximately two days after receiving Boring's call at the restaurant, Al Phillips informed Boring via letter that due to her disturbing call on the evening of August 7, Boring would be suspended from work until the incident was investigated. Based on the inappropriateness of the phone call and his determination that Boring's accusations against Barbara were fictitious, Al Phillips terminated Boring's employment on August 16, 2004.

### C. Boring's medical conditions

In 2001, Boring was diagnosed with advanced gastric reflux, and in 2003 she was diagnosed as having hemangioma, a lesion on her skull, which was not cancerous and did not need to be surgically removed.[4] Dr. Citow, a specialist in neurosurgery, told Boring that he doubted her brain lesion was causing much symptomology and that it could be easily removed. On multiple occasions, Boring told Al Phillips that she had doctor's appointments to treat her "brain cancer" and that she needed to undergo surgery for "brain cancer." However, Boring was never told by any physician that she had cancer. She also testified in her deposition that she does not have cancer and that she has never made allegations about having cancer.

---

[4] Boring's Third Amended Complaint describes her tumor as "inoperable." However, in her deposition Boring clarified that what she means by "inoperable" is "that at this point [her doctors] don't want to operate on it." Dr. Citow did inform Boring that if the tumor grew or started to present problems, then it would be removed.

During her employment at World Gym, Boring suffered from very severe headaches. Though not based on any physician's recommendation, Boring needed to turn her office lights off and close the blinds for five to ten minutes a few times a day while she was at work in order to deal with her headaches. Boring had difficultly eating certain foods, experienced chest pains while eating, and at times felt like she couldn't breathe. She kept an oxygen tank in her office, which Boring says she used on one occasion. She also felt nauseated, experienced burning in her stomach and esophagus, and suffered from frequent diarrhea and migraine headaches. Boring received treatment for her gastric reflux with various medications and a fundoplication surgery. One of Boring's doctors attributed most of her symptoms to "suboptimally treated gastroesophageal reflux disease" and stated that "her psychometric assessment demonstrated a poor quality of life which is attributable to her condition" as well as "a component of reactive depression."

Boring was also diagnosed with fibromyalgia, which she had between 2000 and 2004. Fibromyalgia is not pled in Boring's third amended complaint as an "impairment" and Boring testified that her fibromyalgia did not restrict her in performing any of her work duties during her employment at World Gym. Also between 2000 and 2004, Boring had other medical diagnoses, which included hermangiomes on the spine, Raynaud's disease, esophageal motility, problems with her vision, chronic pain, chest pains, and neurological problems.

During the time she was employed at World Gym, Boring's workload was neither changed nor reassigned. World Gym never altered its expectations of Boring's workload. Although Boring had to rush through some of her work to get it done before doctor's appointments, she was always able to perform all of her work duties. When she took days off of

work for doctor appointments or medical procedures, she was able to return to work in her same position.  Her esophagus condition did not restrict her in performing any of her work duties between 2000 and 2004.  Boring explained her medical conditions to World Gym and World Gym understood what Boring told them about her medical conditions.  Despite any challenges her medical conditions may have posed, Boring did a good job at World Gym, even earning a merit increase in her pay on June 2, 2003.

World Gym maintained an FMLA policy.  World Gym's Handbook required FMLA leave to be supported by certification issued by the employee's health care provider.  Each time Boring requested to leave early, come in late, or take a day off to attend a doctor's appointment or to have a procedure or test performed, she considered the request to be one for leave under the FMLA.  Boring never provided World Gym with any certifications from doctors or health care providers to support her requests for FMLA leave.  World Gym provided Boring with the flexibility to attend all of her doctor's appointments and medical procedures.  She was never denied a request to come in early or late or take a day off for these reasons, and she never missed any of her appointments.  Although she was never denied any requests to leave work for her medical appointments, Boring testified that Al Phillips gave his permission for her to leave work "with hesitation" and that he was not satisfied with having to grant her the leave.  On occasion, Al Phillips gave Boring more letters to type before she left for an appointment, though Al Phillips testified that no work assignments required completion before she could leave.  According to Boring, each time she had to ask for time off of work, Al Phillips would tell her, "if you were a horse, they would shoot you," and on one occasion just after she shared with him the results of the MRI done on her brain, Al Phillips told her, "I just don't have any sympathy for

sick people." Al Phillips testified that he never expressed disapproval, irritation, or impatience with Boring's requests for time off to attend doctor's appointments. He further testified that he always expressed sympathy for Boring and that he never told Boring "if you were a horse they would shoot you." He said that he has made that comment about himself before in reference to his arthritis.

### D. Boring's complaints about thefts and forgeries at World Gym

There were occasional $20 to $30 money shortages at various World Gym locations that were usually reconciled within a day or two. There was one incident in the 1990s where a former comptroller stole thousands of dollars and was arrested by the F.B.I., and on another isolated incident where an employee was caught doing credit card fraud. At some point, Defendants decided to attempt to use money orders instead of cash for certain transactions at the World Gym locations because they would be easier and safer to deposit.

On or about May 22, 2004, Boring accused Barbara Phillips of stealing about $25 from Al Phillips and/or World Gym. The shortage was reconciled about a day later. Boring believes that Barbara began making the allegedly harassing phone calls to Boring in retaliation for Boring's accusation. Around the same time in 2004, Boring also accused Barbara of forging several World Gym checks. Boring never reported any alleged theft or forgery at World Gym to the authorities. Boring also accused Al and Barbara Phillips and their employee children of being reimbursed by corporate funds for their personal expenses, but she testified that she has no knowledge of whether any allegedly borrowed money was paid back to World Gym.

## III. STANDARD OF REVIEW

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000). I consider the record in the light most favorable to the non-moving party, and draw all reasonable inferences in the non-movant's favor. *Lesch v.. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002). I will accept the non-moving party's version of any disputed fact only if it is supported by relevant, admissible evidence. *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996).

## IV. ANALYSIS

### A. Americans with Disabilities Act

In Count I, Boring alleges both theories of recovery under the ADA – failure to accommodate and disparate treatment. Both theories require Plaintiff to prove by a preponderance of the evidence that she suffers a disability as defined by the ADA. Under the

ADA, an individual is disabled if she (1) has a physical or mental impairment which substantially

limits one or more of her major life activities; (2) has a record of such an impairment; or (3) is

regarded as having such an impairment. *See* 42 U.S.C. § 12102(2)(A)-(C); *DePaoli v. Abbott*

*Labs.*, 140 F.3d 668, 671 (7th Cir.1998). The ADA itself sheds little light on the meaning of

these terms, so courts routinely rely upon Equal Employment Opportunity Commission

("EEOC") regulations implementing Title I of the ADA. *See* 29 C.F.R. § 1630 et seq.; *Baulos v.*

*Roadway Express, Inc.*, 139 F.3d 1147, 1151 (7th Cir.1998).

The EEOC regulations define "substantially limits" as meaning that the individual is

either unable to perform a major life activity or is "[s]ignificantly restricted as to the condition,

manner or duration under which an individual can perform a particular major life activity as

compared to the condition, manner, or duration under which the average person in the general

population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii); *Haiman v.*

*Village of Fox Lake*, 55 F.Supp.2d 886, 892 (N.D. Ill. 1999). "Major life activities" means

"functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working." 28 C.F.R. § 1630.2(I). Whether an impairment

substantially limits a major activity is determined in light of: (1) the nature and severity of the

impairment; (2) the duration or expected duration of the impairment; and (3) its permanent or

expected permanent or long term impact. 29 C.F.R. § 1630.2(j)(2)(I)-(iii). The term "substantial"

must "be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota*

*Motor Mfg., Ky. Inc. v. Williams*, 534 U.S. 184, 197 (2002). "Not every impairment that affects a

major life activity will be considered disabling; only if the resulting limitation is significant will

it meet the ADA's test." *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998)

(citation omitted). The inquiry is an individualized one: whether this plaintiff's impairment

constitutes a significant barrier to her employment. *Moore v. J.B. Hunt Trans., Inc.*, 221 F.3d 944, 953 (7th Cir. 2000). Furthermore,

> The Act is not a general protection of medically afflicted persons. It protects people who are discriminated against by their employer (the only form of disability discrimination at issue in this case) either because they are in fact disabled or because their employer mistakenly believes them to be disabled. If the employer discriminates against them on account of their being (or being believed by him to be) ill, even permanently ill, but not disabled, there is no violation.

*Christian v. St. Anthony Med. Ctr.*, 117 F.3d 1051, 1053 (7th Cir. 1997).

The impairments alleged in Boring's Third Amended Complaint are: (1) "inoperable brain tumor," also referred to as "inoperable brain lesions", and (2) "advanced Gastric Reflux Disease." The major life activities that are allegedly substantially limited are: "eating, swallowing, seeing, concentrating, thinking, and working." Defendants seek summary judgment on Count I because Boring's medical conditions do not qualify her as a disabled person under the ADA.

### i. Actual Disability

Whether a plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for a court to decide. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003). It is the ADA plaintiff's burden to prove a disability by offering evidence that the extent of the limitation in terms of her own experience is substantial. *Alberton's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). Ascertaining whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment. *Doebele*, 342 F.3d at 1129, 1130 n.5.

Defendants argue that Boring does not have a physical or mental impairment that substantially limits a major life activity, and thus she cannot prevail on her actual disability theory. Boring asserts the undisputed evidence creates a genuine issue of material fact as to whether her brain tumor and gastric reflux disease substantially impair her ability to perform the major life activities of breathing,[5] eating, swallowing, seeing, concentrating, thinking, and working.[6]

With respect to Boring's allegation that her disability included an "inoperable brain tumor," the record reveals that in 2003 Boring's doctors diagnosed her as having a hemangioma, or a lesion on her skull. Boring testified in her deposition, though her third amended complaint states otherwise, that her lesion (referred to by Boring as a "tumor") is not cancer, and she confirmed that she was never told by any doctor that it was cancer. In addition, she testified that her treating physician informed her that he doubted the lesion was causing much if any symptoms and that it could easily be removed if it did become symptomatic.

With respect to Boring's "advanced Gastric Reflux," she was diagnosed with the condition in 2001 and received treatment in the form of medications and a fundoplication surgery. At least one treating physician attributed her symptoms to "suboptimally treated gastroesophageal reflux disease" and stated that "her psychometric assessment demonstrated a

---

[5] In her third amended complaint, Boring doesn't specifically list "breathing" as one of the major life activities substantially impaired by her brain tumor and/or her gastric reflux disease. However, she does list "breathing" in response to Defendants' motion for summary judgment.

[6] Boring devotes a portion of her response brief to the issue of whether Defendants failed to accommodate her. The ADA requires accommodation only for a "qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). Because I find that Boring has not proved she was disabled within the meaning of the ADA, World Gym had no obligation under the ADA to provide her with any accommodations.

poor quality of life which is attributable to her condition" and includes "a component of reactive depression." Boring testified that her gastric reflux condition did not restrict her from performing any of her duties during her employment at World Gym.

### a. Working

To the extent that "working" is a major life activity, Boring must show that she had an inability to work in "a broad range of jobs, rather than a specific job." *Cassimy v. Bd. of Educ.*, 461 F.3d 932, 936 (7th Cir. 2006) (quoting *Toyota*, 534 U.S. at 200). The evidence shows that Boring functioned well at World Gym, and that despite her medical conditions she continued to perform each and every one of her duties throughout her employment. The record shows that Al Phillips never complained about Boring's performance at work, and indeed she earned a merit increase in her pay on June 2, 2003. Boring specifically testified that her esophagus condition did not restrict her in performing any of her duties at work. When she had to take several days off for a medical procedure, she was able to come back to the exact same position and workload. A reasonable finder of fact could not conclude that Boring was substantially limited in working because of her brain tumor and/or her gastric reflux disease.

### b. Seeing, Concentrating, or Thinking

Boring's doctors told her they doubted if her brain tumor was causing any symptoms, and if it began to cause problems, it could easily be removed. Boring testified that she had cluster headaches and migraines and as a result had to turn her office lights off and close the blinds and her door for 10-15 minutes a few times a day. She also testified that these measures were not pursuant to any of her doctors' recommendations. Boring has not adduced any evidence that she was substantially limited in seeing, concentrating, or thinking. *See Dendinger v. Ohio*, 207 Fed. Appx. 521, 528 (6th Cir. 2006) ("the need to lie down occasionally in a dark, quiet

room" is not enough to show that headaches substantially limited plaintiff's ability to engage in major life activities); *Swart v. Premier Parks Corp.*, 88 Fed. Appx. 366, 370-71 (10th Cir. 2004) (plaintiff suffering from migraine headaches due to chemotherapy treatment who did not present evidence of significant functional impairment did not prove migraines substantially limited any major life activity). To the contrary, she testified that she experienced no interference with her job duties and that she was able to perform all her work responsibilities. A reasonable finder of fact could not conclude that Boring was substantially limited in seeing, concentrating, or thinking because of her brain tumor and/or her gastric reflux disease.

### c. Breathing, Eating, or Swallowing

Boring testified that she cannot eat certain foods, that she must eat intermittently, and that at times she experienced chest pain from swallowing, diarrhea, and nausea. But she hasn't offered proof that any of these medical afflictions substantially limited a major life activity. In *Holt*, a plaintiff with cerebral palsy was not substantially limited in a major life activity even though she at times had difficulty chewing and swallowing food. *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762, 767 (10th Cir. 2006) ("These specific limitations . . . do not permit a rational factfinder to conclude Holt is prevented from [the major life activity] of caring for herself."). Boring's conclusory statements that she was substantially limited in breathing, eating, and swallowing are not proof of any substantial limitation. *See Waldrip v. Gen. Elec. Co.*, 325 F.3d 652, 656 (5th Cir. 2003). A reasonable finder of fact could not conclude that Boring was substantially limited in breathing, eating, or swallowing because of her brain tumor and/or her gastric reflux disease.

Boring has offered no evidence that she was substantially limited in any major life activity. "The substantial-limit requirement is the linchpin" for a claim under the ADA, for

without it, "the ADA would cover any minor impairment that might tangentially affect major life activities." *Waldrip*, 325 F.3d at 655. Accordingly, Boring has failed to satisfy the "demanding standard" that would meet the ADA's definition of "disabled" under her actual disability theory. *See Toyota*, 534 U.S. at 197.

### ii. *"Record of a Disability"*

In order to demonstrate a "record of" a disability, Boring must prove that she has a record of an impairment and that impairment substantially limits one or more major life activities. 29 C.F.R. § 1630.2(k). The existence of a medical impairment, without further evidence that the impairment substantially limits one or more major life activities, is insufficient to establish a record of a disability. *See Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1457 (7th Cir. 1995). Boring has failed to submit evidence to this effect. Boring's medical record does not suggest that any of her medical conditions were significantly limiting. Nor does Boring's own testimony indicate that any impairment she may have suffered substantially limited major life activities. To the contrary, her testimony recounts that none of her medical conditions interfered with her ability to successfully perform all of her duties at World Gym.

### iii. *"Regarded As" Disabled*

Boring argues in the alternative that Defendants regarded her as disabled, but the evidence before me is equally barren of facts that would support this claim. Under a "regarded as" theory, a plaintiff must prove that either: (1) the employer mistakenly believes the employee has a physical impairment that substantially limits a major life activity; or (2) the employer mistakenly believes that an actual, nonlimiting impairment substantially limits a major life activity. 29 C.F.R. § 1630.2(1); *Nese v. Julian Nordic Const. Co.*, 405 F.3d 638, 641 (7th Cir. 2005). In other words, the employer "must believe either that one has a substantially limiting

impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Awareness of the condition, however, is not the same thing as a belief that the condition is substantially impairing. *Cassimy*, 461 F.3d at 937 (citing *Krocka v. City of Chicago*, 203 F.3d 507, 514 (7th Cir. 2000).

Boring testified that she explained her medical conditions and procedures to Al Phillips. Al Phillips testified that he was aware of Boring's conditions and her many doctor appointments and that "in spite of [them], she seemed to function extremely well" and that she was "quite helpful." He was aware that "sometimes she had difficulty eating," but testified that it was "nothing major." None of the facts suggests that Al Phillips or anyone else at World Gym regarded Boring as having a substantially limiting impairment; her workload was never changed nor were any of her duties ever reassigned to a different World Gym employee. Boring submits that Al Phillips' repeated statements of "if you were a horse they would shoot you" and his comment that he has "no sympathy for sick people" is proof that he regarded Boring as disabled. Even assuming that Al Phillips made those comments, such statements do not demonstrate that Al Phillips entertained any misperceptions about Boring's medical conditions or ever regarded her as disabled. No reasonable fact finder could conclude that Defendants regarded Boring as disabled within the meaning of 42 U.S.C. § 12102(2)(C).

On the basis of the facts before me, I conclude that Boring was not disabled within the meaning of the ADA. Summary judgment is granted for Defendants with respect to Count I.

## B. Family and Medical Leave Act

Boring relies on both the interference and retaliation theories of recovery under the FMLA. *See* 29 U.S.C. § 2615(a)(1)-(2). To prevail on her FMLA interference claim, Boring

must establish that: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled. *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006). Each time Boring requested to leave early, come in late, or take a day off of work to attend a doctor's appointment, she considered the request to be one under the FMLA. Boring's interference claim fails because it is undisputed that she was never denied a request to take time off work to attend a doctor's appointment or other medical procedure.

Turning to Boring's charge of retaliation under the FMLA, Defendants argue that the evidence is devoid of any direct or circumstantial evidence indicating that Boring was terminated for any reason other than her unprofessional conduct. Proceeding under the direct method of proof, Boring submits that the following facts show that her protected FMLA leave was a substantial or motivating factor in Al Phillips' decision to terminate her: (1) Al Phillips' comments that he doesn't have sympathy for sick people and his repeated remark, "if you were a horse, they would shoot you"; (2) Barbara Phillips' harassing phone calls; (3) the temporal sequence between Boring's complaints about Barbara Phillips' thefts and forgeries, Barbara's harassing phone calls, and Boring's suspension and ultimate termination; (4) Boring's good job performance; (5) the alleged inconsistencies in World Gym's rationale for Boring's termination; and (6) Defendants' failure to investigate the circumstances that led up to Boring's phone call to the restaurant in Wisconsin before making the decision to terminate her employment at World Gym.

Contrary to Boring's assertion, the facts in this case are not similar to those in *Lewis v. School District #70*, 523 F.3d 730 (7th Cir. 2008), a case in which the plaintiff offered enough

19

direct and circumstantial evidence of her employer's discriminatory motive to avert summary judgment on her FMLA retaliation claim. In *Lewis*, the plaintiff had "prominent direct evidence" of retaliation; the school superintendent sent the plaintiff a letter offering only one justification for the decision to terminate her: "you miss too much work to meet the essential functions of your present assignment." *Id*. at 742. In addition, the superintendent explicitly told Lewis that the school board had decided to demote her because of her absenteeism. *Id.* Moreover, circumstantial evidence indicated, among other things, that the school board decided to build a case for Lewis' discharge on the ground of incompetence. *Id.* Lewis also had recordings from school board meetings in which board members referred to the FMLA's requirements as "just ludicrous" and "a fiasco." *Id*. Furthermore, Lewis took intermittent FMLA leave from her bookkeeping job and could not timely keep up with all of the duties of her position. *Id.* at 743. Because the school district held Lewis to the unrealistic expectation that she should accomplish all of the duties of her position during her period of leave, the Court believed it would be reasonable for a jury to find that the leave granted was only illusory. *Id.* The Seventh Circuit held that all of these facts, "in the aggregate," were sufficient under the direct method of proof to survive summary judgment. *Id.* at 744.

Boring's arguments related to her FMLA retaliation claim combine and confuse discriminatory motive on the basis of her protected FMLA activity, on the basis of her alleged disability, and on the basis of her reporting the alleged thefts and forgeries occurring at World Gym. However, she must present evidence that she was terminated *on account of her protected activity. Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) (emphasis added). Any temporal relation between Boring's accusations and interactions with Barbara Phillips regarding internal accounting issues and Boring's termination are irrelevant to her claim for

FMLA retaliation. A temporal proximity between Boring's leave and her termination could establish the necessary causal connection between the two, but the facts do not show this to be true and neither does Boring argue it to be so. *King v. Preferred Technical Group*, 166 F.3d 887, 893 (7th Cir. 1999). Likewise, Al Phillips' statement about not having sympathy for sick people and his repeated remark "if you were a horse, they would shoot you" do not supply inferences that Boring's leave from work to attend her appointments motivated Al Phillips' decision to terminate her.

Unlike the plaintiff in *Lewis*, Boring presents no direct evidence that Defendants terminated her employment because of her requests to take leave to attend her numerous doctor's appointments. Neither was the leave Boring was granted merely illusory. Boring testified that despite her numerous doctor appointments, she was able to complete all of her work duties, and Al Phillips had no complaints about Boring's ability to keep up with her work. Her workload was never changed nor reassigned, nor did she make any such requests. There is no dispute that Boring performed her job at World Gym well, and she was not terminated on account of any performance shortfalls. *See Ridings*, 537 F.3d at 771 (employer's acknowledgment that plaintiff's termination was not due to poor work quality does not lead to inference that termination was retaliatory).

Boring misconstrues undisputed facts when she argues that Defendants gave inconsistent rationales for her termination. World Gym's letter to the EEOC clearly indicates that Boring was terminated as a result of her "unprofessional conduct." This is no different than Al Phillips' deposition testimony that he decided to fire Boring because of the inappropriate phone call, nor is it different from the reason Al Phillips wrote to Boring in her termination letter: "I can find no record of the 8 disturbing phone calls . . . As a result of the unsubstantial allegation, I regretfully

feel that your association with World Gym is terminated." Each of the statements indicate that Boring was terminated as a result of her disturbing phone call made to Al Phillips on a Saturday while he was out of town, in which Boring accused Barbara Phillips of making harassing and threatening phone calls to her earlier that day.

The fact that Al Phillips did not conduct a formal investigation into the circumstances surrounding the disturbing phone call also does not infer that Boring was terminated in retaliation for requesting and taking FMLA leave.

On the basis of the facts before me, a reasonable jury could not conclude that Boring's FMLA leave was a substantial or motivating factor in Al Phillips' decision to fire Boring from her position at World Gym. Boring falls far short of "constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker." *Ridings*, 537 F.3d at 771 (quoting *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006)). In any event, Defendants have proffered a legitimate, non-discriminatory reason for Boring's termination. Boring cannot demonstrate that the stated reason is false and that instead discrimination on account of her leave was the real reason behind her termination. Accordingly, I grant Defendants' motion for summary judgment on Count IV.

### C. Fair Labor Standards Act

With respect to Boring's claim under the FLSA (Count V), she alleges that Defendants failed to pay her overtime for hours worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a)(1). Defendants argue that Boring's FLSA claim fails because she falls under the FLSA's administrative exemption, and exempt employees are not subject to the overtime provisions of the FLSA. *See* 29 U.S.C. § 213(a)(1). The test for whether an employee falls into the administrative exemption involves the satisfaction of three conditions: (a) the employee must

22

be paid on a salary basis, (b) the employee's primary duty must involve office or nonmanual work directly related to management policies or general business operation, and (c) the employee's work must include work requiring the exercise of discretion and independent judgment. 29 C.F.R. § 541.2(e)(2), incorporating by reference § 541.2(a)(1)[7]; *Demos v. City of Indianapolis*, 302 F.3d 698, 701 (7th Cir. 2002). The burden is on World Gym to prove that administrative exemption applies.

### i. Salary versus hourly basis

Defendants submit that Boring was a salaried employee. Boring contends that she was told she was paid hourly. The portion of Boring's New Employee Hire Sheet, dated August 17, 2000, which reads "HOURLY ___ SALARY ___ COMMISSION ONLY ___" is not filled out. The line below, which is filled out, reads "RATE 1: <u>9/HR - 80 HRS</u> RATE 2: <u>$21,840.00/ANN</u>". Payroll records from June through July of 2000 indicate Boring was earning $9 per hour. Boring's Earnings Record report shows she was paid $13.50 for one hour of overtime worked in June 2000. A Personnel Change Report dated July 15, 2000 indicates a change from "9.0000" to "840.000" and under the field labeled "description" reads 'HOURLY TO SALARY." Subsequent payroll records through July, 2001 indicate Boring was paid $840 salary bi-weekly. Payroll records beginning July 27, 2001 through May 9, 2003 indicate Boring was paid $920 salary bi-weekly. The records indicate slight increases in Boring's bi-weekly salary beginning May 10, 2003 until her termination in August, 2004, when she was earning

---

[7] I refer here to the version of the regulations published in 2003. The regulations have since been amended, but I am required to apply the regulations that were effective at the time of Boring's termination on August 16, 2004. The 2004 regulations became effective on August 23, 2004. *See Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 369 (7th Cir. 2005).

$1100 bi-weekly.[8]  A June 2, 3003 Payroll Status Change record reveals that Boring received a fifty cent merit increase in pay.  Another June 22, 2004 Payroll Status Change record shows a $1.00 merit increase in Boring's pay.

Boring testified that she doesn't know if she was an hourly or salary employee, but that she recalls her starting pay at World Gym as $9 per hour and that at some point she was told that she was paid hourly.  She testified that she submitted time cards for at least some period of her employment, including in the beginning few weeks and during the final few months.  None of these time cards have been produced in the record.

Al Phillips testified "at one time I believe she was hourly and another time salary, but I don't know when it was changed."  With regard to Boring's fifty cent increase in pay, the transcript from Al Phillips' deposition reads:

> Q:  Does this indicate to you that Shirley Boring, whose name appears at the top as the employee, was receiving a 50 cent per hour increase in her pay?
> A:  Yes.
> Q:  Is that consistent in your opinion with someone who is being paid on a salary rather than an hourly basis?
> A:  It might have been computed and converted into a salary.
> Q:  Is that your testimony, that that is what occurred?
> A:  I don't know.

The payroll records, New Employee Hire Sheet, and Personnel Change Report all confirm that Boring was hired as an hourly employee at $9 per hour to do data entry, and about a month later, coinciding with her promotion to accounts payable and secretary, she switched to a salary employee.  No reasonable finder of fact could conclude otherwise.  Although Boring's merit increases were initially recorded as fifty cents and one dollar, those amounts were, as Al Phillips

---

[8]  The one exception to this is the two week period from May 24, 2003 through June 6, 2003 where the payroll record indicates Boring earned $768 bi-weekly salary.

testified, converted into her salary pay, as documented by the payroll records for the corresponding pay periods. The records show one hour of overtime worked during Boring's first month of employment, for which she was compensated $13.50, or time and a half of her regular pay. I find that Defendants have satisfied the salary basis test. Beginning July 15, 2000, Boring was a salaried employee at World Gym.

*ii. Primary duty and discretion/independent judgment tests*

To prove that Boring was an exempt administrative employee, Defendants are also required to show that Boring's primary duty involved office or nonmanual work directly related to management policies or general business operations and that the performance of such primary duty included work requiring the exercise of discretion and independent judgment. *See* 29 C.F.R. § 541.214. Al Phillips testified at his deposition that Boring essentially performed accounts payable and secretarial-type work.[9] These tasks resemble the work of non-exempt "bookkeepers, secretaries, and clerks of various kinds" who "hold the run-of-the-mine positions in any ordinary business and are not performing working directly related to management policies or general business operations." 29 C.F.R. § 541.205(c)(1). Barbara Phillips also testified that Boring "was Al's – like his secretary. Basically, you know, that's it." Boring testified that her work did not require the exercise of discretion and independent judgment, and Defendants introduced little or no evidence to the contrary. Boring's discretion as to her work hours including when she would take lunch is not the type of "real and substantial" discretion

---

[9] Boring testified that she performed various instances of manual work, including painting the office, cleaning Al Phillips' condo, and driving him to the airport. Al Phillips disputes that any of these tasks, if performed, were part of Boring's job and that if she did them, she did them on her own account or in the capacity as a friend doing a friend a favor. In any event, everyone agrees that any of these alleged instances of manual work did not comprise Boring's "primary duty" at World Gym.

envisioned by the regulations. 29 C.F.R. § 541.207(d)(1) (discretion and independent judgment "must be exercised with respect to matters of consequence"). Also, her reviews of Arletha Thompson's cash reconciliation reports seem like isolated assignments to check the accuracy of numbers and accounting rather than a true supervisory function that would require independent judgment. In addition, Defendants' assertion that Boring's duties included customer service is not supported by the deposition testimony to which they cite.

Defendants rely on a description of Boring's job duties as they appear on her resume. Her resume lists her positions at World Gym as "Accounts Payable, Secretary, Office Manager." A sampling of the responsibilities listed includes: "Managed 8 full-time employees," "Customer Service," "Assisted company comptroller in budgeting, locating and reducing company losses," "Security and overseeing of repairs," "Revised and produced Employee Handbook," "Coordinated resolution of internal theft," "Assisted in creating slogans and artwork for advertising and sales events," and "Recommended changes that increased the monthly collections of bad debt by the outside collection company." The appropriate inquiry, though, is into Boring's actual job duties and not into what she lists on her resume. Boring denies that she actually performed office manager duties, managed 8 full time employees at World Gym, or actually determined any revisions to be made in the Employee Handbook. Based on the testimony in the record, a reasonable finder of fact could conclude that Boring's job description as listed on her resume is incompatible with the actual work she performed. Both Al and Barbara described Boring's primary duties as letter writing and issuing checks.

A reasonable finder of fact could conclude that Boring's primary duty at World Gym was not directly related to management policies or general business operations and that her work did not include any meaningful exercise of discretion or independent judgment. Accordingly,

Defendants have not met their burden of proof that Boring fits within the administrative exemption to the FLSA, and their motion for summary judgment on this claim must be denied.

### D. Liquidated Damages

Boring's claim for liquidated damages is wholly dependent upon her claim under the FLSA. Because summary judgment has been denied on that claim, it must also be denied with regard to Boring's claim for damages as a result of Defendants' alleged failure to pay her overtime.

I note, however, that Defendants dispute that Boring ever worked any overtime hours during her employment at World Gym. Boring testified in her deposition that she kept track of her overtime hours on a punch card for her "own benefit of proof that [she] put in extra time for any [her] time that [she] needed so that it wouldn't be thrown in [her] face later." She never submitted these cards to World Gym, but rather kept them in her desk. As a result, she acknowledges that World Gym would have no record of any overtime hours she may have worked, and in fact the payroll records produced by Defendants do not indicate any overtime other than the one hour in June of 2000. That Boring testified in her deposition to working certain hours in order to make up for hours she had previously taken off does not conclusively indicate that Boring never worked overtime. The same is true of Al Phillips' testimony that he doubts Boring "ever worked overtime anyway." These statements don't prove anything one way or the other about whether Boring ever actually worked any overtime hours on which to base her FLSA claim. Boring bears the burden of proving that she performed overtime work for which she was not properly compensated. *See Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686-87 (1946). Although if World Gym failed to keep proper and accurate records, then Boring will have carried her burden if she proves that she performed work for which she was improperly

compensated and if she produces sufficient evidence to show that amount and extent of that work as a matter of just and reasonable inference. *Id. at 687-88.* On the basis of the facts before me, Boring has failed to produce anything but her self-serving testimony that she in fact worked over forty hours in a single week during her employment.

### E.  Retaliatory Discharge

Boring's claim for retaliatory discharge is based on her allegation that she was retaliated against for reporting theft at World Gym.  To prevail on her claim of retaliatory discharge, Boring must show that:  (1) World Gym terminated her; (2) the termination was in retaliation for her activities; and (3) the discharge violates a clear mandate of public policy.  *Hartlein v. Illinois Power Co.*, 601 N.E.2d 720 (Ill. App. Ct. 1992).  The second element cannot be proven where the employer has a valid, nonpretextual reason for the employee's termination.  *Tipsworld v. Ogilvy & Mather, Inc.*, 918 F.Supp. 217, 223 (N.D. Ill. 1996).  Thus, in the absence of direct evidence that Boring's accusations of theft against Barbara Phillips caused her termination, once Defendants produce some valid reason for the dismissal, the burden remains with Boring to show that the employer's purported reason is no more than a mere pretext.  *Meister v. Georgia-Pacific Corp.*, 43 F.3d 1154, 1160 (7th Cir. 1995).

The only evidence Boring offers is the timing of her complaints regarding accounting inconsistencies with her termination, but even that timeline does not support Boring's argument. On or about May 22, 2004, Boring accused Barbara Phillips of stealing $25 from World Gym. Barbara allegedly began making harassing phone calls to Boring in early July.  On August 7, 2004, Boring called Al Phillips while he was at dinner in Wisconsin to report that Barbara Phillips was making harassing phone calls earlier that day.  Boring was fired on August 16, 2004. The temporal distance between Boring's accusations of theft and her termination (almost four

months) fails to establish a causal link between the two events. *See McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797-98 (7th Cir. 1997) (a sequence of events over a 2-3 day period established a sufficient causal nexus); *Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 506 (7th Cir. 1998) (five months gap between filing charge of discrimination and termination was too much temporal distance to show causal link).

Furthermore, a dispute over an internal accounting issue, as alleged here, does not equate with a clearly mandated public policy. *Tipsworld*, 918 F.Supp at 224 (dispute over accounting decision that did not involve refusal to engage in fraudulent or illegal accounting practices did not violate clearly mandated public policy). Illinois courts have consistently refused to expand the tort of retaliatory discharge beyond two situations: (1) where discharge stems from asserting a worker's compensation claim, and (2) where discharge is for certain activities referred to as "whistle-blowing." *Geary v. Telular Corp.*, 793 N.E.2d 128, 134 (Ill. App. Ct. 2003). The retaliatory discharge alleged here over a dispute about a missing $25 that was reconciled about a day later does not implicate the "whistle-blowing" scenario. *See Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 879-80 (Ill. 1981) (court found viable cause of action for retaliatory discharge for plaintiff who was fired after supplying information to local law enforcement that fellow employee might be violating the criminal code).

Defendants' motion for summary judgment on Boring's claim for retaliatory discharge is granted.

## V. CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is granted with respect to Boring's claim under the ADA, her claim for retaliatory discharge, and her claim under the FMLA (Counts I , II, and IV). Defendants' motion for summary judgment is denied with respect to Boring's claim under the FLSA and corresponding claim for liquidated damages (Counts V and VI).

ENTER:

James B. Zagel
United States District Judge

DATE: March 17, 2009